UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Oliver N. Greene, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> Board of Regents of the University ) <br> System of Georgia, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. <br><br><br> **Jury Trial Demanded** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW, Plaintiff Oliver Greene, and files this *Complaint for Damages and Injunctive Relief* against Defendant Board of Regents of the University System of Georgia, for violating Titles I and II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701. In support thereof, Plaintiff offers the following:

### JURISDICTION AND VENUE

1. This Court has original, federal-question jurisdiction over this action, pursuant to 28 U.S.C. § 1331.

2. This Court has personal jurisdiction over Defendant. The tortious actions in question occurred, in part, in Fulton County, Georgia, and Defendant

1

resides in Fulton County, Georgia, which is located within this district and division.

3. Venue is proper in this Court because Fulton County, Georgia, is located within this district and division and the events in question occurred, in part, therein.

## PARTIES

4. Plaintiff Oliver Greene ("Dr. Greene") submits himself to the jurisdiction of this Court.

5. Defendant is the agency of the State of Georgia which administers all public universities in the State, including Georgia State University ("GSU").

6. At all times relevant to this complaint, Dr. Greene was a tenured professor at GSU, and GSU was his employer for the purposes of Title I of the ADA.

7. Defendant is a public entity for the purposes of Title II of the ADA.

8. Defendant is a recipient of federal financial assistance for the purposes of the Rehabilitation Act.

9. Defendant may be served with the summons and complaint at its Office of Legal Affairs.

## FACTS

10. Dr. Greene began teaching at GSU in 2000. He became a tenured professor in 2007.

11. Since he began, Dr. Greene has taught in GSU's School of Music, with an instructional emphasis on academic courses, such as those which study music as a cultural and historical phenomenon.

12. Dr. Greene has never taught practical, applied music courses requiring hands-on instruction.

13. Dr. Greene suffers from a medical condition which makes him prone to chronic respiratory infections such as chronic sinusitis and chronic laryngitis.

14. Dr. Greene has suffered from these ailments his entire adult life.

15. The source of his issues is most often mold and other environmental allergens. As he has aged, he has become so sensitive to these irritants that, even when he is not suffering an outright infection, he is frequently hoarse, short of breath, fatigued, and has difficulty thinking and concentrating.

16. In 2008, Dr. Greene's condition became severe enough that he began aggressively seeking professional help from numerous specialists. On one occasion, he underwent six weeks of intravenous treatment through a peripherally inserted central catheter (also known as a "PICC" line).

17. In 2013 his doctors determined that the humidity and allergenic biodiversity in the Southeastern United States were likely significant factors

contributing to his chronic illness and that he would never have relief from his symptoms so long as he lived in Georgia.

18.     In 2015 and 2016, with GSU's knowledge and approval, Dr. Greene made several trips to the Southwestern United States to see if the arid, desert climate there would be more hospitable.

19.     While on these trips, Dr. Greene experienced immediate relief from the symptoms of his chronic condition. Upon his returns to Georgia, he experienced immediate re-aggravation of his symptoms.

20.     In 2017, Dr. Greene requested that GSU allow him to relocate to the Southwest and to continue his teaching and research remotely.

21.     His reasons for making this request were that such an accommodation would ameliorate his symptoms and thereby also improve his work performance as a teacher and as a researcher.

22.     GSU approved Dr. Greene's 2017 request to teach remotely.

23.     In 2017, Dr. Greene moved to the Southwest, and he began teaching remotely from California, with GSU's permission, in the Fall 2017 semester.

24.     At this time, Dr. Greene also agreed to double the class sizes of his two most popular courses for no additional compensation from GSU.

25.     In or around March 2021, after Dr. Greene had been teaching remotely for more than three years, GSU modified its policies to require that

remote-teaching arrangements, which had been left to the discretion of the requesting faculty-member's department, now be evaluated through GSU's formal ADA accommodation channels.

26. Per the new policy, in or around May of 2021, Dr. Greene applied for reapproval of his remote-teaching arrangement in an email to Ms. Quinyata Mallard, GSU's "Assistant Director of Benefits, FMLA and ADA." At the time, he and his superiors in the school of music did not anticipate any issues with getting his arrangement reapproved through the new process.

27. On July 22, 2021, Ms. Mallard emailed Dr. Greene, informing him that his request to continue his remote teaching would be denied.

28. Ms. Mallard's July email did not contend that Dr. Greene's request would cause GSU undue hardship.

29. Ms. Mallard's July email did not contend that Dr. Greene was not entitled to reasonable accommodations under the ADA.

30. Ms. Mallard's July email denied Dr. Greene's request on one basis, that his remote teaching "would not be a reasonable accommodation the employer is required to provide."

31. Ms. Mallard's July email did not discuss how Dr. Greene's request was unreasonable in the context of his particular employment situation. The email only stated, generally, that "[i]n the case of allergies, reasonable

accommodations typically involve limiting exposure in the workplace to the trigger."

32. Ms. Mallard's email did not acknowledge that Dr. Greene had already been teaching remotely for four years at that point. It rather concluded, using only prospective language, that his request "would not enable the performance of [Dr. Greene's] service . . . or teaching responsibilities."

33. As set forth in GSU's Faculty Handbook, "Service" and "Teaching" are two of the "three primary functions" faculty fulfill at GSU.

34. These "three primary functions" are the criteria by which GSU faculty are measured in their annual evaluations. "Excellent" is the highest grade a faculty member can usually receive in an annual evaluation.

35. Dr. Greene's performance evaluation for 2019, one of the years in which he taught remotely the entire year, rated him as "Very Good in Service" and "Excellent in Teaching."

36. Dr. Greene's performance evaluation for 2020, another year in which he taught remotely the entire year, rated him even higher, as "Excellent in Service" and "Excellent in Teaching."

37. On August 20, 2021, Ms. Mallard sent Dr. Greene another email, this time under letterhead of the GSU Benefits Office, formally denying his request to continue working remotely, and instead offering Dr. Greene "the following

effective and reasonable workplace accommodations: Provision of an air purifier for [his] office."

38. Dr. Greene promptly appealed this decision, citing, among other things, his 2019 and 2020 performance evaluations—his two most recent at that time.

39. On October 21, 2021, GSU denied Dr. Greene's appeal in a Memorandum authored by Kieran Morrow, GSU's "Senior Director, Equity & Civil Rights Compliance."

40. Like Ms. Mallard's August email, the October Memorandum expressly acknowledged Dr. Greene's protections under the ADA and his right to reasonable accommodation for his disability.

41. Like Ms. Mallard's August email, the October Memorandum did not discuss how allowing Dr. Greene to continue teaching remotely would cause GSU any kind of hardship—much less an undue hardship.

42. Like Ms. Mallard's August email, the October Memorandum only denied Dr. Greene's appeal because, in GSU's analysis, allowing him to continue working remotely was not a reasonable accommodation. Specifically, the October Memorandum quoted the section from Ms. Mallard's July email which contends that Dr. Greene's request "would not be a reasonable accommodation the employer is required to provide."

43. The October Memorandum alleged—as the only support for its conclusion—that leadership in the School of Music was concerned about the limitations imposed by Dr. Greene's remote teaching. The Memorandum cited as evidence Dr. Greene's 2020 performance evaluation—which, as stated above, gave him superior grades in the categories of both Teaching and Service.

44. After citing these concerns it attributed to the School of Music leadership, the October Memorandum concluded that "the remote accommodation is not reasonable because it interferes with the essential functions of teaching/service."

45. The October Memorandum did not directly address how this alleged "interfere[nce] with the essential functions of teaching/service" rendered Dr. Greene's requested accommodation unreasonable in the context of his particular employment situation.

46. These formal denials of Dr. Greene's request and appeal—and the conspicuous failure to engage with his specific medical needs and the duties of his position—reflect deliberate indifference to Dr. Greene's rights, by several GSU administrators, including Ms. Mallard and Director Morrow.

47. Because his appeal carried over into the Fall 2021 semester, GSU allowed Dr. Greene to continue working remotely that semester.

48.     In November of 2021, after Dr. Greene pointed out to GSU leadership that he knew they were allowing one of his colleagues to continue teaching remotely, GSU allowed Dr. Greene to continue working remotely through the end of the 2021-2022 school year.

49.     Also in November of 2021, in response to GSU's demand that he return to work in person, Dr. Greene expressed his concern that, for the sake of his own health and safety, if GSU did not reverse its decision, he would have to transition to "retired" status with the university. In response, GSU attempted to accept Dr. Greene's <u>resignation</u>, which he never offered.

50.     Because GSU still refused to grant Dr. Greene his requested accommodation, he transitioned to "retired" status at the conclusion of the 2021-2022 school year. GSU still includes him as an associate professor in its faculty directory as of the filing of this Complaint.

51.     On March 29, 2022, Dr. Greene filed a charge of discrimination with the EEOC, against GSU, alleging discrimination under the ADA based on the foregoing facts.

52.     GSU did not provide a Position Statement in response to Dr. Greene's EEOC charge.

53.     On August 1, 2022, the EEOC ended its investigation and issued Dr. Greene a Notice of Right to Sue.

54. Since the Fall 2022 semester began, because Dr. Greene has not moved back to Georgia, GSU is not allowing him to teach or earn his salary.

55. GSU is still offering Dr. Greene's most popular course—Rhythm & Blues, Rock and Rap—this Fall 2022 semester, and it is still being taught remotely and asynchronously, only now by a different instructor.

### LEGAL CLAIMS

### Count I – Title I of the Americans with Disabilities Act ("ADA")

56. By this reference, Plaintiff incorporates the above factual statements as if fully stated herein.

57. Title I of the ADA prohibits qualified employers from discriminating against qualifying employees, and it specifically identifies, as one form of prohibited discrimination, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

58. GSU has more than fifteen employees, and therefore is a "covered entity" for the purposes of Title I of the ADA. 42 U.S.C. §§ 12111(2); 12111(5).

59. Dr. Greene's employment history with GSU, as set forth above, demonstrates his ability to perform the essential functions of his employment

position with and without reasonable accommodation, and so he is a "qualified individual" for the purposes of Title I of the ADA. 42 U.S.C. § 12111(8).

60. Dr. Greene suffers from a "disability" within the meaning of the ADA, as defined at 42 U.S.C. § 12102, in that his chronic respiratory issues substantially limit several major life activities, including but not limited to breathing, thinking, and speaking.

61. Dr. Greene suffers from a "disability" within the meaning of the ADA, as defined at 42 U.S.C. § 12102, in that GSU regards Dr. Greene as disabled.

62. Dr. Greene's requested remote-teaching accommodation is a reasonable accommodation considering, among other things, his experience, tenure, instructional emphasis, and history of positive performance evaluations while teaching remotely for four consecutive years under the very arrangement he desires.

63. Dr. Greene's requested accommodation does not require GSU to undertake significant difficulty or expense—financially, operationally, or otherwise—and so does not impose an "undue hardship" on GSU's business operations, as that term is defined in 42 U.S.C. § 12111(10).

64. GSU nevertheless decided, as of October 2021, for reasons that are still not totally clear, to refuse to let Dr. Greene continue teaching remotely.

11

65. GSU is therefore liable to Dr. Greene for disability discrimination in violation of Title I of the ADA. Specifically, for its illegal conduct, GSU is liable to Dr. Greene for both prospective relief and compensatory damages including but not limited to pain and suffering, lost wages, attorneys' fees, and other costs of litigation.

**Count II – Title II of the ADA**

66. By this reference, Plaintiff incorporates the above factual statements as if fully stated herein.

67. Title II of the ADA provides that no "public entity" shall discriminate against a "qualified individual with a disability" with respect to said entity's "services, programs, or activities." 42 U.S.C. § 12132.

68. In the Eleventh Circuit, Title II's protections extend to employees of public entities. *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 820 (11th Cir. 1998).

69. GSU, as an instrumentality of the State of Georgia, is a "public entity" for the purposes of Title II of the ADA, as that term is defined in 42 U.S.C. § 12131(1).

70. Employment is one of the "services, programs, or activities" GSU provides as a public entity, as those terms are used in 42 U.S.C. § 12132.

71. Dr. Greene, despite his disability, is fully capable of discharging his job duties with and without reasonable accommodation, and so he is a "qualified individual with a disability" for the purposes of Title II of the ADA, as that term is defined in 42 U.S.C. § 12131(2).

72. GSU, by reason of Dr. Greene's disability, has denied him equal opportunity to participate in its services as a public employer, and so GSU is liable to Dr. Greene for disability discrimination in violation of Title II of the ADA. Specifically, for its deliberate indifference to his rights under the ADA, GSU is liable to Dr. Greene for both prospective relief and compensatory damages including but not limited to pain and suffering, lost wages, attorneys' fees, and other costs of litigation.

**Count III – Rehabilitation Act**

73. By this reference, Plaintiff incorporates the above factual statements as if fully stated herein.

74. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

75. GSU receives "Federal financial assistance," as that term is used in

13

29 U.S.C. §794(a).

76. GSU is liable to Dr. Greene for disability discrimination in violation of the Rehabilitation Act for all the same reasons as under Titles I and II of the ADA as set forth above. Specifically, GSU is liable to Dr. Greene for both prospective relief and pecuniary damages including but not limited to lost wages, attorneys' fees, and other costs of litigation.

### Count IV – Breach of Contract

77. As a tenured professor, Dr. Greene is not an "at-will" employee. He has a contract of employment with GSU which provides, among other things, that his employment can only be terminated for good cause.

78. The terms and conditions of Dr. Greene's employment contract with GSU are governed by the most recent iteration of GSU's tenure policy to which Dr. Greene manifested assent.

79. GSU's above-described misconduct, for all practical purposes, effects a termination of Dr. Greene's employment without cause.

80. GSU is therefore liable to Dr. Greene for breach of his employment contract and for all the actual and consequential damages thereof.

WHEREFORE, Plaintiff prays:

a. for a trial by jury;

b. for judgment in his favor on the claims asserted herein;

c. for an order declaring Defendant to be in violation of the ADA and Rehabilitation Act;

d. that Defendants be required to pay compensatory damages to Plaintiff, in an amount determined by the enlightened conscience of the jury;

e. that Plaintiff be awarded reasonable attorneys' fees and costs; and

f. that the Court grant other legal and equitable relief as the court finds appropriate.

Respectfully submitted this October 28, 2022

/s/ *James Radford*
James Radford
Georgia Bar No. 108007

/s/ *Jake Knanishu*
Jake Knanishu
Georgia Bar No. 597103
*Counsel for Plaintiff*

RADFORD & KEEBAUGH
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300
james@decaturlegal.com
jake@decaturlegal.com